**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Samuel V. Lopez,          )    No. CV-98-0072-PHX-SMM
                        )
           Petitioner,   )    <u>DEATH PENALTY CASE</u>
                        )
vs.                   )
                        )
                        )    **MEMORANDUM OF DECISION**
Dora Schriro, et al.,      )    **AND ORDER**
                        )
           Respondents.  )
                        )

Petitioner, Samuel V. Lopez, filed a Petition for Writ of Habeas Corpus alleging that he is imprisoned and sentenced to death in violation of the United States Constitution. In this Order, the Court reviews the merits of the seven remaining claims. For the reasons set forth herein, the Court concludes that Petitioner is not entitled to relief.

**BACKGROUND**

In the late morning of October 29, 1986, in response to a concerned caller, the police made a "check welfare" visit to the apartment of Estafana Holmes, a fifty-nine-year-old woman.[1] Inside they found Holmes's partially nude body blindfolded with her pajama pants and with a scarf stuffed in her mouth. The apartment was blood-spattered and in disarray with broken and displaced furnishings. The victim's throat had been sliced, and she had been

---

[1] This factual summary is based on the Court's review of the record and the Arizona Supreme Court's opinion upholding Petitioner's convictions, *State v. Lopez*, 163 Ariz. 108, 110, 786 P.2d 959, 961 (1990).

1  stabbed more than twenty times in her left breast, upper chest, and lower abdomen.  The

2  victim had seminal fluid in her vagina and anus.

3      Petitioner was seen in the neighborhood the night before the crime as well as in the

4  early morning after the murder, looking wet as if he had just washed himself.  While under

5  questioning several days later about an unrelated matter, Petitioner asked about a woman

6  who had been stabbed and had her throat slashed.  The cutting of the victim's throat had not

7  been publically released.  Petitioner's fingerprints were matched to prints found in the

8  victim's apartment, and his bodily fluids were consistent with the semen found in her body.

9      On April 27, 1987, a jury convicted Petitioner of first degree murder, sexual assault,

10  kidnaping, and burglary.  Maricopa County Superior Court Judge Peter D'Angelo presided

11  over Petitioner's trial and sentenced him to death for the murder and to prison terms for the

12  other offenses.   On direct appeal the Arizona Supreme Court affirmed Petitioner's

13  convictions and prison sentences; however, the court vacated one of the aggravating factors

14  supporting Petitioner's death sentence and remanded for re-sentencing on the murder.  *State

15  v. Lopez*, 163 Ariz. 108, 116, 786 P.2d 959, 967 (1990) (*Lopez I*).  On August 3, 1990, Judge

16  D'Angelo re-sentenced Petitioner to death, and the Arizona Supreme Court affirmed.  *State

17  v. Lopez*, 175 Ariz. 407, 857 P.2d 1261 (1993) (*Lopez II*).

18      Petitioner filed a petition seeking habeas relief in this Court on January 13, 1998 (Dkt.

19  1),[2] which he amended on November 16, 1998 (Dkt. 27).  After briefing (Dkts. 37, 50, 56,

20  62), Petitioner withdrew Claim 13 (Dkt. 93), and the Court dismissed Claims 3, 4, 6, 7, 9-11,

21  and 14 as procedurally barred, Claims 12 and 17 as premature, and Claim 10 (in the

22  alternative), 15, and 16 as meritless (Dkts. 92, 160).[3]  The parties briefed the merits of the

23

24      [2] "Dkt." refers to the documents in this Court's case file.

25      [3] At the time the Court ruled on the procedural status of Petitioner's conviction-

26  related claims, it simultaneously granted a stay of his sentencing-related claims while

27  Petitioner pursued relief in state court based on *Ring v. Arizona*, 536 U.S. 584 (2002).  (Dkt.

   92 at 35.)  The stay was in effect from January 7, 2003, until July 12, 2004.  (Dkts. 92, 144).

28

1   remaining claims. (Dkts. 107, 116, 126, 178, 196, 199.) Subsequently, the Court dismissed

2   Claim 1A, while ruling on a corresponding motion for evidentiary hearing, and granted

3   evidentiary development as to Claim 1B. (Dkt. 131.)

## LEGAL STANDARD FOR RELIEF UNDER THE AEDPA

4

5   The Antiterrorism and Effective Death Penalty Act (AEDPA) established a

6   "substantially higher threshold for habeas relief" with the "acknowledged purpose of

7   'reducing delays in the execution of state and federal criminal sentences.'" *Schriro v.

8   Landrigan*, 127 S. Ct. 1933, 1939-40 (2007) (quoting *Woodford v. Garceau*, 538 U.S. 202,

9   206 (2003)). The AEDPA's "'highly deferential standard for evaluating state-court rulings'

10  . . . demands that state-court decisions be given the benefit of the doubt." *Woodford v.

11  Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333

12  n.7 (1997)).

13  Under the AEDPA, a petitioner is not entitled to habeas relief on any claim

14  "adjudicated on the merits" by the state court unless that adjudication:

15      (1) resulted in a decision that was contrary to, or involved an unreasonable
        application of, clearly established Federal law, as determined by the Supreme
16      Court of the United States; or

17      (2) resulted in a decision that was based on an unreasonable determination of
        the facts in light of the evidence presented in the State court proceeding.
18

19  28 U.S.C. § 2254(d). The relevant state court decision is the last reasoned state decision

20  regarding a claim. *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v.

21  Nunnemaker*, 501 U.S. 797, 803-04 (1991)); *Insyxiengmay v. Morgan*, 403 F.3d 657, 664

22  (9th Cir. 2005).

23  "The threshold question under AEDPA is whether [the petitioner] seeks to apply a rule

24  of law that was clearly established at the time his state-court conviction became final."

25  *Williams v. Taylor*, 529 U.S. 362, 390 (2000). Therefore, to assess a claim under subsection

26  (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs

27  the sufficiency of the claims on habeas review. "Clearly established" federal law consists

28

1   of the holdings of the Supreme Court at the time the petitioner's state court conviction

2   became final. *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 127 S. Ct. 649, 653 (2006);

3   *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). Habeas relief cannot be granted if

4   the Supreme Court has not "broken sufficient legal ground" on a constitutional principle

5   advanced by a petitioner, even if lower federal courts have decided the issue. *Williams*, 529

6   U.S. at 381; *see Musladin*, 127 S. Ct. at 654; *Casey v. Moore*, 386 F.3d 896, 907 (9th Cir.

7   2004). Nevertheless, while only Supreme Court authority is binding, circuit court precedent

8   may be "persuasive" in determining what law is clearly established and whether a state court

9   applied that law unreasonably. *Clark*, 331 F.3d at 1069.

10          The Supreme Court has provided guidance in applying each prong of § 2254(d)(1).

11   The Court has explained that a state court decision is "contrary to" the Supreme Court's

12   clearly established precedents if the decision applies a rule that contradicts the governing law

13   set forth in those precedents, thereby reaching a conclusion opposite to that reached by the

14   Supreme Court on a matter of law, or if it confronts a set of facts that is materially

15   indistinguishable from a decision of the Supreme Court but reaches a different result.

16   *Williams*, 529 U.S. at 405-06; *see Early v. Packer,* 537 U.S. 3, 8 (2002) (per curiam). In

17   characterizing the claims subject to analysis under the "contrary to" prong, the Court has

18   observed that "a run-of-the-mill state-court decision applying the correct legal rule to the

19   facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to'

20   clause." *Williams*, 529 U.S. at 406; *see Lambert v. Blodgett*, 393 F.3d 943, 974 (9th Cir.

21   2004).

22          Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court

23   may grant relief where a state court "identifies the correct governing legal rule from [the

24   Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or

25   "unreasonably extends a legal principle from [Supreme Court] precedent to a new context

26   where it should not apply or unreasonably refuses to extend that principle to a new context

27

28                                                - 4 -

where it should apply." *Williams*, 529 U.S. at 407.  For a federal court to find a state court's application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the petitioner must show that the state court's decision was not merely incorrect or erroneous, but "objectively unreasonable." *Id.* at 409; *Landrigan*, 127 S. Ct. at 1939; *Visciotti*, 537 U.S. at 25.

Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state court decision was based upon an unreasonable determination of the facts.  *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (*Miller-El II*).  A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. 322, 340 (2003) (*Miller-El I*); *see Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004).   In considering a challenge under § 2254(d)(2), state court factual determinations are presumed to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *Landrigan*, 127 S. Ct. at 1939-40; *Miller-El II*, 545 U.S. at 240.

## DISCUSSION

### Claim 1B

Petitioner alleges that trial counsel was ineffective for failing to ensure that a biased juror did not sit on the jury.  In a prior order, the Court found that there was a material factual dispute regarding whether a juror that had been struck for cause by the trial court actually served on Petitioner's jury.  (Dkt. 131 at 21.)  The Court further found that if Petitioner proved his allegations he would be entitled to relief on this claim (*id.* at 21-22); thus, all that remains is purely a factual dispute.   The Court granted evidentiary development and expansion of the record as to any evidence developed (*id.* at 23); the parties have submitted their additional evidence (Dkts. 135, 136, 140, 149).

Both parties agree, and the evidence confirms, that a Norman White served on the jury

- 5 -

and was polled at the time of Petitioner's verdict.[4] The dispute centers on whether that White is the same juror who earlier had been struck by the court. Petitioner relies primarily on the trial transcript, which contains the following exchange indicating that White was excused for cause and replaced by a Timothy Kett, in response to the court's question asking whether any juror had family or close friends that served as law enforcement officers:

> THE COURT: Mr. White?
>
> A JUROR: A cousin. 12 years on the police department, and close friends retired police officers.
>
> THE COURT: Anything about those relationships that would lead you to believe you'd give any more or less credence to the testimony of the police officer simply because he or she were a police officer?
>
> A JUROR: I feel in the line of work police do, I'd have to be partially influenced by their good, solid police work.
>
> THE COURT: You don't think you could judge that testimony objectively and on the same standards as you would any other witness?
>
> A JUROR: I believe I could do that.
>
> THE COURT: Well, let's make sure. You're not telling me you would believe a police officer more than you would a civilian witness?
>
> A JUROR: I'd have more faith in the police officer.
>
> THE COURT: Well, we'll get back to the other question then. You think you would give more weight to the testimony of a witness simply because he was a police officer?
>
> A JUROR: I believe I would.
>
> THE COURT: You couldn't judge that testimony objectively, on the same standards as you would any other witness?
>
> A JUROR: I believe I would have to judge in the favor of police officers' testimony.
>
> THE COURT: All right, sir. I'll excuse you, please report back to the jury commissioner.
> The clerk will call the name of another juror.

---

[4] White died in March 1995 (Dkt. 136, Ex. 1); no evidence regarding this issue was gathered from him.

THE CLERK:  Timothy Kett.

(RT 4/16/87 at 57-59.)

Respondents rely on contrary evidence.  First, the court's minute entry indicates that Kett was called as a replacement for a William Knighton who was excused for cause.  (ROA ME 35 at 53.)[5]  Similarly, the trial court's hand-marked jury list indicates that Knighton was struck for cause, and White was not struck and served on the jury.  (ROA 36.)  The court reporter provided an affidavit, at the request of the State, in which she averred that her notes indicate she did not specifically hear the name White at the disputed place in the transcript.[6] (Dkt. 116, Ex. D.)  Rather, she heard only a long "i" sound, and selected White's name from the jury list and inserted it in her transcription.  (*Id.*)

At the State's request, Knighton reviewed the voir dire transcript and, in an affidavit, expressed confidence that the questioning regarding the credibility of a police officer's testimony was addressed to him and not White as reflected in the transcript.  (Dkt. 135, Ex. A at 1.)  Knighton stated that he recalled telling the judge he would give more credence to, and have more faith in, a police officer's testimony than he would a civilian's.  (*Id.* at 1, 2.) Petitioner's counsel deposed Knighton, and his testimony was consistent with his affidavit. (*Compare* Dkt. 135, Ex. A *with* Dkt. 149, Ex. 3.)

Despite evidentiary development, Petitioner is unable to prove that a biased juror

---

[5] "ROA" refers to the docket numbers from the three-volume record on appeal from post-conviction proceedings prepared for Petitioner's petition for review to the Arizona Supreme Court (Case No. CR-97-0423-PC).  "ME" refers to the trial court's minute entries, contained in one volume of the three-volume ROA.  "RT" refers to the reporter's transcripts from Petitioner's state court proceedings.  "PR Dkt." refers to the docket numbers of documents filed at the Arizona Supreme Court during Petitioner's petition for review (Case No. CR-97-0423-PC). The state court original reporter's transcripts and certified copies of the trial and post-conviction records were provided to this Court by the Arizona Supreme Court on July 29, 1999.  (Dkt. 57.)

[6] When Petitioner's counsel asked the court reporter for a copy of these notes they could no longer be located.  (Dkt. 136, Ex. 2.)

- 7 -

served on his jury. Based on the evidence proffered, the only plausible explanation is that the transcript contained an error. Accepting Petitioner's theory – that White was dismissed on page fifty-eight of the transcript – leaves no record to explain Knighton's dismissal. No one contends that Knighton served on the jury, the hand-marked jury list indicates he was struck for cause, the parties' peremptory strikes are all allotted to other jurors, and the transcript is devoid of any reference to Knighton being struck. Further, Knighton has a specific recollection of both his initial exchange with the judge, reflected on pages fifty to fifty-one of the transcript, and informing the judge that he would have more faith in a police officer, a belief he affirmed during his deposition (Dkt. 149, Ex. 3 at 64). Finally, the court's minute entry indicates Knighton was excused for cause and replaced by Kett.

Because Petitioner has not shown that a biased juror served on his jury, his allegation of ineffectiveness necessarily fails and he is not entitled to relief. Claim 1B is dismissed.

**Claim 1C**

In the Amended Petition, Petitioner alleges that his counsel "failed to properly investigate and prepare the case for trial and sentencing including failing to prepare the defense expert Dr. Bendheim." (Dkt. 27 at 10.) Petitioner incorporated the general factual background of the petition into Claim 1, which included the following facts: Petitioner was homeless, poor, and intoxicated and "high on something" on the night of the murder; the killing appeared to be impulsive and done by someone psychotic; Petitioner's counsel presented no evidence at the sentencing proceeding; the judge found no mitigating circumstances at Petitioner's first sentencing; on resentencing, there was evidence that Petitioner came from a dysfunctional family with a history of substance abuse and violence, and that he had a history of substance abuse and psychiatric disorders; on resentencing, there was evidence that Petitioner had a different personality when intoxicated, and Dr. Bendheim testified that Petitioner likely suffered from pathological intoxication. (*Id.* at 3, 5-6, 7-8.)

In the body of Claim 1C, Petitioner reiterates some of the same facts and further

alleges that Petitioner's father abandoned the family, they suffered from financial hardship and extreme poverty, Petitioner had a history of exposure to toxic substances, and he dropped out of high school with a sixth grade reading level. (*Id.* at 11-12, 13.) Petitioner alleges that his counsel failed to provide Dr. Bendheim with copies of witness testimony regarding Petitioner's intoxication on the night of the crime and failed to provide other background information noted in the claim. (*Id.* at 12-13.) Finally, Petitioner asserts that it was necessary for Petitioner's counsel to investigate this information and provide it to the expert so that the expert could establish a baseline of Petitioner's cognitive functioning, compare it to his functioning when intoxicated, assess whether intoxication would exacerbate any underlying psychological conditions, assess Petitioner for the presence of addictive disease and/or neurological deficits, and evaluate any other influences on his behavior or thought processes during the murder. (*Id.* at 13.)

Exhaustion

In their Answer Re: Procedural Status of Claims, Respondents stated as to the entirety of Claim 1: "Petitioner presented these claims first, in his petition for post-conviction relief, and then, in a petition for review to the Arizona Supreme Court. Thus, they have been properly exhausted." (Dkt. 37 at 12.) Based on this assertion, the Court ordered briefing on Claim 1C as set forth in the Amended Petition. (Dkt. 160 at 7, 22.) Now, in their merits brief, Respondents argue that the claim alleged in this Court is much broader than the claim Petitioner exhausted in state court, and that the claim as now stated is procedurally defaulted. (Dkt. 196 at 12.)

To the extent Respondents contend that Claim 1C as stated in Petitioner's merits brief is substantially broader than that alleged in the Amended Petition, the Court disagrees. A comparison of the allegations in the Amended Petition and Petitioner's merits brief reveals that they are substantially similar, although Petitioner conducted an investigation between the filing of the two documents and has now submitted supporting evidence for his

1   allegations.  (*Compare* Dkt. 27 at 3-13, *with* Dkt. 178 at 2-45.)  Thus, Respondents should

2   have raised exhaustion and procedural default in their Answer, before Petitioner's counsel

3   expended the time and funds to conduct an investigation.  However, because Respondents

4   are now contending that the allegations in the Amended Petition are substantially altered

5   from those exhausted in state court, and Petitioner has had an opportunity to, and did,

6   respond to that defense (Dkt. 199 at 21-23), the Court will review that assertion.[7]

7           *Principles of Exhaustion and Procedural Default*

8           Under the AEDPA, a writ of habeas corpus cannot be granted unless it appears that

9   the petitioner has exhausted all available state court remedies.  28 U.S.C. § 2254(b)(1); *see*

10  *also Coleman v. Thompson*, 501 U.S. 722, 731 (1991); *Rose v. Lundy*, 455 U.S. 509 (1982).

11  To exhaust state remedies, a petitioner must "fairly present" the operative facts and the

12  federal legal theory of his claims to the state's highest court in a procedurally appropriate

13  manner.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999); *Anderson v. Harless*, 459 U.S.

14  4, 6 (1982); *Picard v. Connor*, 404 U.S. 270, 277-78 (1971).  If a habeas claim includes new

15  factual allegations not presented to the state court, it may be considered unexhausted if the

16  new facts "fundamentally alter" the legal claim presented and considered in state court.

17  _____

18      [7]  Although Petitioner notes that Respondents initially conceded exhaustion as to
19  Claim 1C, he does not allege that Respondents have waived exhaustion; rather, he contends
    that the claim was properly exhausted in state court.  (Dkt. 199 at 21-23.)  Further, this Court
20  is permitted to sua sponte consider procedural default even if not properly raised by
    Respondents.  *See Vang v. Nevada*, 329 F.3d 1069, 1073 (9th Cir. 2003)*; cf. Day v.*
21  *McDonough*, 547 U.S. 198, 209 (2006) (holding that district courts may sua sponte consider
    the timeliness of a habeas petition, just as circuit courts have held can be done for other
22  affirmative defenses such as procedural default).  Although the State provided no explanation
    for its failure to raise this defense in its Answer, because Respondents asserted procedural
23  default during the district court briefing process, the Court finds it should be considered.  *See*
24  *Perruquet v. Briley*, 390 F.3d 505, 518 (7th Cir. 2004) (reaching procedural default on appeal
    even though not raised by the state in district court because comity and federalism weighed
25  against looking at a claim that no state court was given the opportunity to review, and de
    novo review was inconsistent with the high level of deference to state court decisions
26  mandated by the AEDPA and would amount to a windfall to the habeas petitioner).

27

28                  - 10 -

1    *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986).

2         Exhaustion requires that a petitioner clearly alert the state court that he is alleging a

3    specific federal constitutional violation.  *See Casey v. Moore*, 386 F.3d 896, 913 (9th Cir.

4    2004); *see also Gray v. Netherland*, 518 U.S. 152, 163 (1996) (general appeal to due process

5    not sufficient to present substance of federal claim); *Lyons v. Crawford*, 232 F.3d 666, 669-

6    70 (2000), *as amended by* 247 F.3d 904 (9th Cir. 2001) (general reference to insufficiency

7    of evidence, right to be tried by impartial jury, and ineffective assistance of counsel lacked

8    specificity and explicitness required); *Hiivala v. Wood*, 195 F.3d 1098, 1106 (9th Cir. 1999)

9    ("The mere similarity between a claim of state and federal error is insufficient to establish

10   exhaustion.").  A petitioner must make the federal basis of a claim explicit either by citing

11   specific provisions of federal law or case law, *Lyons*, 232 F.3d at 670, or by citing state cases

12   that plainly analyze the federal constitutional claim, *Peterson v. Lampert*, 319 F.3d 1153,

13   1158 (9th Cir. 2003) (en banc); *cf. Fields v. Washington*, 401 F.3d 1018, 1022 (9th Cir. 2005)

14   (mere citation to a state case that conducts both a state and federal law analysis does not, by

15   itself, satisfy exhaustion).

16        In Arizona, there are two primary procedurally appropriate avenues for petitioners to

17   exhaust federal constitutional claims:  direct appeal and post-conviction relief proceedings.

18   Rule 32 of the Arizona Rules of Criminal Procedure governs PCR proceedings and provides

19   that a petitioner is precluded from relief on any claim that could have been raised on appeal

20   or in a prior PCR petition.  Ariz. R. Crim. P. 32.2(a)(3).  The preclusive effect of Rule

21   32.2(a) may be avoided only if a claim falls within certain exceptions (subsections (d)

22   through (h) of Rule 32.1) and the petitioner can justify why the claim was omitted from a

23   prior petition or not presented in a timely manner.  *See* Ariz. R. Crim. P. 32.1(d)-(h), 32.2(b),

24   32.4(a).

25        A habeas petitioner's claims may be precluded from federal review in two ways.

26   First, a claim may be procedurally defaulted in federal court if it was actually raised in state

27

28                                              - 11 -

court but found by that court to be defaulted on state procedural grounds. *Coleman*, 501 U.S. at 729-30. The procedural bar relied on by the state court must be independent of federal law and adequate to warrant preclusion of federal review. *See Harris v. Reed*, 489 U.S. 255, 262 (1989). A state procedural default is not independent if, for example, it depends upon a federal constitutional ruling. *See Stewart v. Smith*, 536 U.S. 856, 860 (2002) (per curiam). A state bar is not adequate unless it was firmly established and regularly followed at the time of the purported default. *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991).

Second, a claim may be procedurally defaulted if the petitioner failed to present it in state court and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Coleman*, 501 U.S. at 735 n.1; *see also Ortiz v. Stewart*, 149 F.3d 923, 931 (9th Cir. 1998) (stating that the district court must consider whether the claim could be pursued by any presently available state remedy). If no remedies are currently available pursuant to Rule 32, the claim is "technically" exhausted but procedurally defaulted. *Coleman*, 501 U.S. at 732, 735 n.1; *see also Gray*, 518 U.S. at 161-62.

Because the doctrine of procedural default is based on comity, not jurisdiction, federal courts retain the power to consider the merits of procedurally defaulted claims. *Reed v. Ross*, 468 U.S. 1, 9 (1984). As a general matter, the Court will not review the merits of a procedurally defaulted claim unless a petitioner demonstrates legitimate cause for the failure to properly exhaust the claim in state court and prejudice from the alleged constitutional violation, or shows that a fundamental miscarriage of justice would result if the claim were not heard on the merits in federal court. *Coleman*, 501 U.S. at 750. Ordinarily "cause" to excuse a default exists if a petitioner can demonstrate that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Id*. at 753. Objective factors which constitute cause include interference by officials which makes compliance with the state's procedural rule impracticable, a showing that the factual or legal basis for a claim was not reasonably available, and constitutionally ineffective assistance of

counsel.  *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  There are two types of claims recognized under the fundamental miscarriage of justice exception to procedural default: (1) that a petitioner is "innocent of the death sentence," – in other words, that the death sentence was erroneously imposed; and (2) that a petitioner is innocent of the capital crime.

*Exhaustion and Procedural Default Analysis*

In his PCR petition, Petitioner alleged ineffective assistance of counsel (IAC) because counsel failed to properly prepare his expert, Dr. Otto Bendheim.  (ROA 116 at 9.) Specifically, Petitioner alleged that counsel failed to provide Dr. Bendheim with four documents – the pretrial statements and trial testimony of Pauline Rodriguez and Yodilia Sabori.  (*Id.*)  Petitioner alleged this was deficient because the statements were available to counsel and they were particularly relevant to the doctor's assessment of pathological intoxication at the time of the crime as these witnesses saw Petitioner's actions and behaviors just a few hours before the murder.  (*Id.* at 10.)  Petitioner alleged he was prejudiced by counsel's failure because this information was the best evidence in support of pathological intoxication and, if it had been provided to Dr. Bendheim initially, he could have provided a more complete and stronger diagnosis at the time of sentencing.  (*Id.* at 10-11.)  The allegations in the Petition for Review are essentially identical and focus solely on counsel's failure to provide Dr. Bendheim the statements by Rodriguez and Sabori that were identified in the PCR petition.  (PR Dkt. 1 at 11-13.)

By continuing to characterize the claim as he did in state court – that counsel failed to prepare his expert witness – Petitioner attempts to shoehorn in the much broader claim that counsel failed to conduct an exhaustive social history investigation (which he should have used to prepare his expert).  However, the claim asserted in state court was a very narrow one, focused solely on counsel's failure to provide the expert with four specific documents from percipient witnesses to support his tentative diagnosis of pathological intoxication.  In contrast, the claim as alleged in this Court is counsel's failure to conduct a comprehensive investigation of Petitioner's background so that the expert could provide a complete and

thorough assessment of Petitioner's cognitive functioning, as well as any psychological conditions, addictive diseases, or neurological deficits, and any other possible influences on Petitioner's behavior and thought processes at the time of the crime.  (Dkt. 28 at 9-10, 11-13.)  In support of his exhaustion argument, Petitioner contends that his allegations in state court went beyond counsel's failure to provide Dr. Bendheim the four documents specifically identified and included counsel's failure to provide "all relevant information"; in support of this proposition, Petitioner quotes from his PCR reply brief and his Petition for Review. (Dkt. 199 at 22.)  This argument is not supported by the record.  The quotes on which Petitioner relies regarding "all the relevant evidence" that counsel should have given Dr. Bendheim, when viewed in the context of the entire argument in those documents and his whole PCR proceeding, clearly refer to the statements by Rodriguez and Sabori that were relevant to his assertion of pathological intoxication not to potentially mitigating background information; they do not reference additional evidence never investigated.   (ROA 116 at 9-11; ROA 138 at 3; PR Dkt. 1 at 11-13.)

The claim as alleged in this Court was not fairly presented because "[a] thorough description of the operative facts before the highest state court is a necessary prerequisite to satisfaction of the standard of *O'Sullivan* and *Harless* that 'a federal habeas petitioner [must] provide the state courts with a 'fair opportunity' to apply controlling legal precedent to the facts bearing upon his constitutional claim.'" *Kelly v. Small*, 315 F.3d 1063, 1069 (9th Cir. 2003) (quoting *Harless*, 459 U.S. at 6), *overruled on other grounds by Robbins v. Carey*, 481 F.3d 1143 (9th Cir. 2007).  It is not sufficient that Petitioner raised a claim of IAC at sentencing based on other deficiencies, without identifying the deficiencies on which he now relies.  *See Carriger v. Lewis*, 971 F.2d 329, 333-34 (9th Cir. 1992) (treating distinct failures by trial counsel as separate claims for exhaustion and procedural default); *Matias v. Oshiro*, 683 F.2d 318, 319-20 & n.1 (9th Cir. 1982) (finding lack of fair presentation when claim broadened to include eight specific deficiencies by counsel that were not raised in state court); *Flieger v. Delo*, 16 F.3d 878, 885 (8th Cir. 1994) (raising specific claims of IAC in

- 14 -

state court does not exhaust all such claims for federal habeas review); *cf. Strickland v. Washington*, 466 U.S. 668, 690 (1984) (requiring identification of the specific "acts or omissions" of counsel being challenged).  In sum, the factual breadth of this claim as alleged in Petitioner's Amended Petition was not presented in state court and is fundamentally altered from that presented during the PCR proceedings.  *Vasquez*, 474 U.S. at 260.

Petitioner is now precluded by Arizona Rules of Criminal Procedure 32.2(a)(3) and 32.4 from obtaining relief in state court on the new broad allegations set forth as Claim 1C. *See* Ariz. R. Crim. P. 32.2(b); 32.1(d)-(h); *Stewart v. Smith*, 202 Ariz. 446, 449, 46 P.3d 1067, 1070 (2002) ("the ground of ineffective assistance of counsel cannot be raised repeatedly"; therefore, if additional ineffectiveness allegations are raised in a successive petition, the claims in the later petition necessarily will be precluded).  Thus, these portions of the claim are technically exhausted but procedurally defaulted, absent a showing of cause and prejudice or a fundamental miscarriage of justice.  In reply to Respondents' argument that this claim is procedurally defaulted, Petitioner did not allege cause and prejudice or a miscarriage of justice to overcome this default.[8]  (Dkt. 199 at 13-23.)

The portions of Claim 1C that extend beyond the narrow claim raised in Petitioner's PCR petition and Petition for Review are dismissed as procedurally barred.

_____

[8]  To properly exhaust the broad IAC allegations of Claim 1C, PCR counsel should have included them in the PCR petition. *See State v. Spreitz*, 190 Ariz. 129, 146, 945 P.2d 1260, 1277 (1997).  While *constitutionally* ineffective assistance of counsel can constitute cause for failure to properly exhaust a claim in state court, Petitioner had no constitutional right to counsel in state PCR proceedings, *see Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987); *Murray v. Giarratano*, 492 U.S. 1, 7-12 (1989); thus, no constitutional violation can arise from ineffectiveness of PCR counsel and, even if alleged, it cannot serve as cause. *Coleman*, 501 U.S. at 752; *Bonin v. Vasquez*, 999 F.2d 425, 429-30 (9th Cir. 1993).
Petitioner previously argued, as to other claims, that there would be a fundamental miscarriage of justice if his defaulted claims were not reviewed on the merits because he is both innocent of the crime and innocent of the death penalty.  In prior orders, the Court rejected those arguments (Dkt. 92 at 24-24; Dkt. 160 at 11-13); the grounds for those denials are equally applicable to any miscarriage of justice arguments regarding Claim 1C.

- 15 -

<u>Analysis of the Exhausted Portion of Claim 1C</u>

Petitioner's claim is exhausted to the extent it alleges IAC for failing to provide Dr. Bendheim with the pretrial statements and trial testimony of Pauline Rodriguez and Yodilia Sabori.

*Background*

At Petitioner's re-sentencing, counsel presented a video deposition of Dr. Otto Bendheim,[9] a psychiatrist, to support a mitigating factor of pathological intoxication.[10]  For his evaluation of Petitioner, Dr. Bendheim interviewed him and reviewed police reports regarding the murder, prior charges and arrests, and descriptions of the crime scene.  (Dkt. 178, Ex. 2 at 3.)  Dr. Bendheim found that Petitioner possibly suffered from pathological intoxication, which he described as causing a person to react to even small quantities of alcohol in a very unusual manner and frequently with extreme violence.  (*Id.* at 4-5.)  Although Petitioner had informed Dr. Bendheim that he was not intoxicated on the night of the crime, the doctor did not believe him because other evidence indicated to the contrary.  (*Id.* at 6.)  Dr. Bendheim found that Petitioner was subject to unusual, out-of-character

---

[9]  Petitioner submitted in this Court a transcript of Dr. Bendheim's video deposition.  (Dkt. 178, Ex. 2.)

[10]  At sentencing, Petitioner's expert and the State's expert both acknowledged the existence of pathological intoxication and agreed that it is included in the Diagnostic and Statistical Manual of Mental Disorders.  (Dkt. 178, Ex. 2 at 21-22; RT 7/13/90 P.M. at 36.)  At the time of Petitioner's sentencing, the disorder was defined as:

    A.    Maladaptive behavioral changes, e.g., aggressive or assaultive behavior, occurring within minutes of ingesting an amount of alcohol insufficient to induce intoxication in most people.
    B.    The behavior is atypical of the person when not drinking.
    C.    Not due to any physical or other mental disorder.

Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 291.40 Alcohol Idiosyncratic Intoxication, at 128-29 (3d ed.-rev. 1987).

reactions including assaultiveness when under the influence of alcohol or drugs, and that "with a great preponderance of probability not certainty," the murder would not have occurred if Petitioner had not been intoxicated at the time of the crime. (*Id.* at 10, 12.) Dr. Bendheim was clear that he could not diagnosis Petitioner with medical certainty, that the diagnosis was tentative, and that it was "to a very large degree" speculative. (*Id.* at 29-30.) On cross-examination, Dr. Bendheim agreed that his opinion was premised, in part, on information that Petitioner acts radically different when intoxicated, and he conceded that his diagnosis would be even more speculative if there were not witnesses or evidence to substantiate that assumption. (*Id.* at 16-17, 26-27.)

In rebuttal, the State presented Dr. Robert Dean, a psychiatrist that had spent much of his career focusing on alcoholism. (RT 7/13/90 P.M. at 17-19.) Dr. Dean testified that he had read a lot about pathological intoxication but that his only professional experience was with one patient presumed to have the condition during his residency. (*Id.* at 23-24.) Further, Dr. Dean stated that the condition was uncommon, and he was not aware of any cases in his twenty-five years of psychiatric practice. (*Id.* at 26.) Dr. Dean explained that there are predisposing factors that may trigger a pathological intoxication reaction; specifically, any condition that could cause brain damage, such as an organic pathology in the brain predisposing the person to epileptic seizures, a stroke, or a degenerative condition. (*Id.*) Although the affected person would not recall what occurred while they were experiencing the intoxication, Dr. Dean testified that the person would normally be aware of the condition because the condition would occur every time he consumed a small triggering amount of alcohol, others would likely report his abnormal behavior, or the amnesiac time lapse would be evident. (*Id.* at 28-29.) Dr. Dean disagreed with Dr. Bendheim's tentative diagnosis and stated why Petitioner's behavior indicated to him that he did not suffer from pathological intoxication. (*Id.* at 32-34.)

At sentencing, the judge found that Petitioner had failed to establish pathological intoxication as a mitigating factor:

> Testimony was presented on behalf of the defendant that he possibly suffered from a condition known as pathological intoxication. Said testimony did not rise to any level of medical certainly, but rather was based upon hypothesis or speculation. The State presented evidence to rebut the hypothesis and speculation. And the court specifically finds that the defendant failed to meet his burden of proof in establishing this mitigating factor by a preponderance of the evidence. Thus this mitigating factor does not exist.

(RT 8/3/90 at 40.)

This claim was raised in Petitioner's PCR petition; he relied on the trial testimony of Rodriguez and Sabori and attached their pretrial interviews and a new affidavit from Dr. Bendheim. (ROA 116, Exs. 3, 30, 31.) Sabori stated that she had seen Petitioner around the neighborhood in the week she had been living there but first spoke to him the night of the murder. (RT 4/21/87 at 68-69; ROA 116, Ex. 31 at 1-2.) She met him at a neighborhood park around 8 p.m. and talked to him for much of the time she was there until 11:15 p.m. (RT 4/21/87 at 70-71; ROA 116, Ex. 31 at 3-4.) Shortly after she went home, approximately ten or fifteen minutes later, Petitioner showed up at her apartment door and she went outside to talk to him. (RT 4/21/87 at 72-73, 77; ROA 116, Ex. 31 at 2, 4.) Sabori reported that Petitioner had been drinking and was intoxicated when he arrived at her apartment, and he was acting differently than he had been at the park. (RT 4/21/87 at 72-72, 77; ROA 116, Ex. 31 at 5.) Petitioner asked Sabori if she got high, and she told him no. (RT 4/21/87 at 73; ROA 116, Ex. 31 at 6.) She testified that Petitioner then disappeared down the alley for a few minutes; when he returned he was shaking and could not stand still, and he acted like he was mad and everything bothered him. (RT 4/21/87 at 73-74; ROA 116, Ex. 31 at 6-7.) When Sabori tried to go inside, Petitioner closed her hand in the door and tried to prevent her from going in so that she would keep talking to him. (ROA 116, Ex. 31 at 7-8.)

Pauline Rodriguez had known Petitioner from the neighborhood and because he had dated her sister for a few months before the murder. (*Id.*, Ex. 30 at 2; RT 4/21/87 at 82.) The evening of the murder she saw him outside her apartment, and she testified that he was "loaded on something." (RT 4/21/87 at 83; ROA 116, Ex. 30 at 4.) She described his tone of voice as angry, and he argued with her and used obscenities. (RT 4/21/87 at 84; ROA

- 18 -

116, Ex. 30 at 7.) She came to the door when Sabori called out to her because Petitioner was preventing Sabori from reentering her apartment. (ROA 116, Ex. 30 at 2-3.) On the other occasions on which she had seen him sober, he was very nice and not mean. (*Id.* at 6; RT 4/21/87 at 87-88.)

In his 1994 affidavit, Dr. Bendheim stated that, having reviewed the statements of Sabori and Rodriguez, his "tentative diagnosis of pathological intoxication [was] more probable than previously expressed," and he could "now make a more certain diagnosis of pathological intoxication." (ROA 116, Ex. 3.) The PCR court denied this claim, finding that counsel's conduct was within prevailing professional norms and that there was no reasonable probability that the sentence would have been different if counsel had not been deficient. (ROA ME 140 at 1-2.)

*Analysis*

IAC claims are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense. 466 U.S. at 687-88.

The inquiry under *Strickland* is highly deferential, and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. Thus, to satisfy *Strickland*'s first prong, deficient performance, a defendant must overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.*

Because an IAC claim must satisfy both prongs of *Strickland*, the reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 at 697 ("if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed"). A petitioner must affirmatively

- 19 -

1   prove prejudice.  *Id.* at 693.  To demonstrate prejudice, he "must show that there is a
2   reasonable probability that, but for counsel's unprofessional errors, the result of the
3   proceeding would have been different.  A reasonable probability is a probability sufficient
4   to undermine confidence in the outcome."  *Id.* at 694.  The calculus involved in assessing
5   prejudice "should proceed on the assumption that the decision-maker is reasonably,
6   conscientiously, and impartially applying the standards that govern the decision."  *Id.* at 695.

7         With respect to prejudice at sentencing, the *Strickland* Court explained that "[w]hen
8   a defendant challenges a death sentence . . . the question is whether there is a reasonable
9   probability that, absent the errors, the sentencer . . . would have concluded that the balance
10  of aggravating and mitigating circumstances did not warrant death."  466 U.S. at 695.  In
11  *Wiggins*, the Court further noted that "[i]n assessing prejudice, we reweigh the evidence in
12  aggravation against the totality of available mitigating evidence."  539 U.S. at 534.  The
13  "totality of the available evidence" includes "both that adduced at trial, and the evidence
14  adduced in the habeas proceeding."  *Id.* at 536 (quoting *Williams v. Taylor*, 529 U.S. at 397-
15  98).

16        In forming his opinion and diagnosis for Petitioner's resentencing, Dr. Bendheim
17  relied on a statement by a Mr. Hernandez that Petitioner was mean when he was drunk, but
18  mild and meek when sober.  (Dkt. 178, Ex. 2 at 14-15.)  Dr. Bendheim also relied on a
19  representation from Petitioner's counsel that "many character witnesses described
20  [Petitioner] as a mild person unless he's drinking.  It's like he is a different person when he
21  drinks."  (*Id.* at 17, 35.)  Dr. Bendheim acknowledged that if that representation – that
22  Petitioner acts radically different when intoxicated – could not be substantiated, then his
23  diagnosis would be more speculative.  (*Id.* at 25, 27.)  Further, Dr. Bendheim was aware that
24  Petitioner was alleged to have been drinking and/or taking drugs an hour to an hour-and-a-
25  half prior to the murder.  (*Id.* at 6, 17.)  Similarly, although Dr. Bendheim acknowledged that
26  his hypothesis was "perhaps weakened a bit" by Petitioner's denial of intoxication at the time
27  of the crime, he stated that he did not believe Petitioner in light of other evidence in the

28                                                    - 20 -

documents he reviewed. (*Id.* at 6-7.)

The new information provided to Dr. Bendheim during the PCR proceeding was minimally different from that on which he previously relied. Rodriguez and Sabori indicated that Petitioner behaved differently, meanly, when intoxicated; Dr. Bendheim had already taken that fact into account from other sources. Further, Rodriguez and Sabori stated their belief that Petitioner was intoxicated in the hours before the murder; again, Dr. Bendheim relied on this fact in making his tentative diagnosis and assessment that the murder would not have occurred if Petitioner had not been intoxicated. Thus, these statements provided merely slightly more corroboration of the information and assumptions on which Dr. Bendheim's testimony was based at the time of resentencing. This limited enhancement was reflected in his new affidavit, which stated that, after reviewing the new statements, his "tentative diagnosis of pathological intoxication [was] more probable than previously expressed," and he could "now make a more certain diagnosis of pathological intoxication." (ROA 116, Ex. 3.)

Dr. Bendheim's affidavit acknowledges that his diagnosis remains tentative and does not suggest it is yet at a level of medical certainty. Further, in his deposition, Dr. Bendheim stated that his diagnosis at the time of resentencing was tentative because he was not present at the time of the crime and Petitioner could not confirm that he undergoes a significant personality change when intoxicated. (Dkt. 178, Ex. 2 at 5-6.) The additional statements he reviewed do not alter the grounds he cited for his tentativeness. Additionally, because the "new" documents he reviewed are substantially similar to the information on which his initial opinion was based, the sentencing court would not be likely to provide his viewpoint with significantly more weight. This is particularly true because the State's expert, Dr. Dean, reviewed the pretrial interview statements of Rodriguez and Sabori on a break from testifying at Petitioner's resentencing and stated that the information they provided did not alter his disagreement with Dr. Bendheim's tentative diagnosis. (RT 7/13/90 P.M. at 50.) Thus, the trial court's reliance on the State's rebuttal of Dr. Bendheim's testimony would remain well-

founded.  Finally, in resentencing Petitioner the trial court did not credit any other mitigation evidence as noteworthy.  (RT 8/3/90 at 40-43.)

In light of the above, the Court finds that, even if Dr. Bendheim initially had been provided all of the documents he eventually reviewed, there is not a reasonable probability that the outcome of the sentencing would have been different.  The PCR court's denial of this claim was not an unreasonable application of Supreme Court law.  Claim 1C, to the extent exhausted, is denied.

**Claim 1D**

Petitioner alleges his trial counsel was ineffective for failing to challenge the inclusion of unadjudicated crimes in the presentence report (PSR).  Specifically, Petitioner alleges he was prejudiced by the inclusion in the PSR of a sexual assault he allegedly committed four days after the charged homicide, which he asserts painted him as a monster.[11]

In the 1990 PSR, the author stated that Petitioner was taken into custody four days after the murder for an alleged sexual assault; while Petitioner was in custody, the police matched his fingerprint and palm print to those found in the murder victim's home and he was booked for the murder.  (ROA 99 at 2.)  Similarly, in the discussion section of the PSR, the author noted that Petitioner was apprehended for the murder while he was being investigated for sexual assault.  (*Id.* at 8.)  Petitioner alleges that counsel's failure allowed for the following argument by the prosecutor:

> You look at these facts, you look at this man's history.  You look at the fact that four days after he murdered this woman he's out there raping another woman.  He's threatening to kill her.  Where is there any mitigation in this man's life, either past, present or future, that is in any way societally redeeming?  There is none.  There's no mitigation here.  There is extreme aggravation.

(RT 8/3/90 at 27.)  Petitioner raised this claim in his PCR petition.  (ROA 116 at 6-8.)  The

---

[11] Petitioner refers generally to other uncharged conduct included in the PSR, but does not allege that it prejudiced him; therefore, those vague allegations are dismissed.  *See Shah v. United States*, 878 F.2d 1156, 1161 (9th Cir. 1989) (holding that vague and conclusory allegations of ineffective assistance do not warrant habeas relief).

- 22 -

1   PCR court denied the claim finding that Petitioner had not demonstrated that his counsel's
2   performance was deficient nor that he had been prejudiced by his counsel's actions.  (ROA
3   ME 140.)

4        Without citation, Petitioner alleges that the judge considered the uncharged conduct
5   in sentencing Petitioner.  First, at the sentencing hearing, the court did not mention the
6   alleged sexual assault in relation to aggravation or mitigation (RT 8/13/90); in its Special
7   Verdict, the court acknowledged that it had reviewed the presentence report, but again did
8   not mention the alleged sexual assault (ROA 67).  Second, absent evidence to the contrary,
9   a judge is presumed to focus only on relevant sentencing factors.  *State v. Beaty*, 158 Ariz.
10  232, 244, 762 P.2d 519, 531 (1988).  Petitioner was sentenced by a judge, not a jury, and
11  "[t]rial judges are presumed to know the law and to apply it in making their decisions."
12  *Walton v. Arizona*, 497 U.S. 639, 653 (1990), *overruled on other grounds by Ring v. Arizona*,
13  536 U.S. 584 (2002).

14       "Non-statutory" aggravation evidence is not recognized in Arizona; the only
15  aggravating circumstances allowed to support a death sentence are enumerated in the
16  governing statute, A.R.S. § 13-703(F), and the sentencing court may only consider evidence
17  in aggravation that tends to establish a statutory aggravating factor.  *State v. Gulbrandson*,
18  184 Ariz. 46, 66, 906 P.2d 579, 599 (1995); *State v. Atwood*, 171 Ariz. 576, 673, 832 P.2d
19  593, 656 (1992), *overturned on other grounds by State v. Nordstrom*, 200 Ariz. 229, 25 P.3d
20  717 (2001).  Because the alleged sexual assault was not relevant, and there is no evidence to
21  the contrary, the trial judge must be presumed not to have relied on the alleged assault in
22  finding the one aggravating factor – that the crime was especially cruel, heinous, and
23  depraved.  *See Gretzler v. Stewart*, 112 F.3d 992, 1009 (9th Cir. 1997) (citing *Walton*, 497
24  U.S. at 653).  Similarly, despite the prosecutor's argument cited by Petitioner, the alleged
25  sexual assault was not relevant rebuttal to any "good character" mitigation because no such
26  evidence was proffered.

27       Finally, in ruling on the PCR petition, the trial court determined that Petitioner had

28

not established a reasonable probability that his sentence would have been different absent counsel's alleged deficiency (ROA ME 140).  *See Portillo v. United States*, 588 F.2d 714, 717 (9th Cir. 1978) (finding that a petitioner fails to demonstrate a reliance on false information in a PSR when the judge rules that he would have issued the same sentence without it).  In sum, when there is no evidence that the judge relied on the challenged information, Petitioner fails to demonstrate prejudice under *Strickland*.  *See Jones v. United States*, 783 F.2d 1477, 1482 (9th Cir. 1986).  This claim is denied.

**Claim 2**

Petitioner argues that the trial court's failure to instruct the jury on a lesser included charge of second degree murder violated his right to due process.  Specifically, Petitioner contends the evidence of his intoxication and the circumstances of the crime (that the assailant acted impulsively and out of control), support the inference that he was not guilty of premeditated first degree murder but of the lesser included offense of second degree murder.  Additionally, Petitioner argues that the Arizona Supreme Court did not apply the proper standard to this claim rendering its ruling contrary to, and an unreasonable application of, clearly established Supreme Court law.

Background

Petitioner was charged under dual theories of first degree murder – felony murder and premeditated murder.  The jury was instructed that the necessary mental state for premeditated first degree murder was satisfied if the defendant "**intended to** or **knew**" he would cause death.  (ROA 43 at 10 (emphasis added).)  With respect to kidnaping and burglary the jury was instructed that the state had to prove that the defendant had acted with "the intent to."  (*Id.* at 12, 15.)  The jury was also given the following instruction regarding intoxication:

> when the actual existence of the culpable mental state of intentionally or with the intent to is a necessary element to constitute any particular species or degree of offense, you may take into consideration the fact that the accused was intoxicated at the time in determining the culpable mental state with which he committed the act.

1
2
3

(*Id.* at 22.)  Petitioner was convicted of kidnaping, burglary, and first degree murder; with respect to the murder conviction, the jury was not asked to make a special finding regarding guilt on felony murder and/or premeditated murder.  (ROA 46, 47, 50.)

4
5
6
7
8
9
10

On direct appeal, Petitioner argued that he was entitled to a second degree murder instruction based on voluntary intoxication.  (Appellant's Opening Br. at 25-26.)  The Arizona Supreme Court found that intoxication could negate the mental state of "intentionally" but did not preclude a finding of "knowingly."  *Lopez I*, 163 Ariz. at 112, 786 P.2d at 963.  Because acting "knowingly" is sufficient to establish premeditation under Arizona law, the court concluded that evidence of intoxication did not require a second degree murder instruction.  *Id.* at 112-13, 786 P.2d at 963-64.

11

Relevant Arizona Law

12
13
14
15
16
17
18

Under Arizona law there is no lesser included offense for felony murder.  *See State v. Celaya*, 135 Ariz. 248, 255, 660 P.2d 849, 856 (1983) (citing *State v. Arias*, 131 Ariz. 441, 641 P.2d 1285 (1982)).  However, second degree murder is a lesser included offense of premeditated first degree murder.  Pursuant to the relevant portion of the first degree murder statute: "A person commits first degree murder if . . . [i]ntending or knowing that his conduct will cause death, such person causes the death of another with premeditation."  A.R.S. § 13-1105.A.1 (West 1988).  Second degree murder is defined as follows:

19

A person commits second degree murder if without premeditation:

20

1.  Such person intentionally causes the death of another person; or

21

2.  Knowing his conduct will cause death or serious physical injury, such person causes the death of another person; or

22
23

3.  Under circumstances manifesting extreme indifference to human life, such person recklessly engages in conduct which creates a grave risk of death and thereby causes the death of another person.

24

A.R.S. § 13-1104.A (West 1988).

25
26
27

The distinction between first and second degree murder is the element of premeditation.  *See State v. Marvin*, 124 Ariz. 555, 557, 606 P.2d 406, 408 (1980); *Vickers*

28

1  *v. Ricketts*, 798 F.2d 369, 371(9th Cir. 1986).  Premeditation is established under Arizona

2  law if:

3      the defendant acts with either the intention or the knowledge that he will kill
       another human being, when such intention or knowledge precedes the killing
4      by a length of time to permit reflection.  An act is not done with premeditation
       if it is the instant effect of a sudden quarrel or heat of passion.

5  A.R.S. § 13-1101.1 (West 1988).

6      Analysis

7      A capital defendant is entitled to an instruction on a lesser included offense "if the

8  evidence would permit a jury rationally to find him guilty of the lesser offense and acquit

9  him of the greater."  *Beck v. Alabama*, 447 U.S. 625, 635 (1980) (quoting *Keeble v. United

10 States*, 412 U.S. 205, 208 (1973)).  The Supreme Court holds that this safeguard is necessary

11 because "when the evidence unquestionably establishes that the defendant is guilty of a

12 serious, violent offense – but leaves some doubt with respect to an element that would justify

13 conviction of a capital offense – the failure to give the jury the 'third option' of conviction

14 on a lesser included offense would seem inevitably to enhance the risk of an unwarranted

15 conviction."  *Id.* at 637.  An instruction on a lesser included offense is required by due

16 process only if warranted by the evidence.  *Hopper v. Evans*, 456 U.S. 605, 611 (1982).

17      *"Contrary to" Prong*

18      Petitioner is correct that the Arizona Supreme Court did not cite *Beck* in its analysis

19 of Claim 2.  However, a state court decision is not rendered contrary to clearly established

20 Supreme Court law solely by lack of citation to that law.  *See Early v. Packer*, 537 U.S. 3,

21 8 (2002) (noting that a state court need not even be aware of controlling Supreme Court law

22 as long as "neither the reasoning nor the result" of its decision contradicts that law).  Rather,

23 a decision is contrary to Supreme Court law if it (1) arrives at an opposite conclusion on a

24 question of law, or (2) arrives at a different result when faced with materially identical facts.

25 *Williams*, 529 U.S. at 405.

26      The Arizona Supreme Court's analysis of Claim 2 is consistent with and not contrary

27

28                                  - 26 -

to the governing principles set forth in *Beck* and *Hooper*.  Petitioner's sole argument before the supreme court was that voluntary intoxication mandated a second degree murder instruction.   The court determined that, because intoxication did not entirely negate premeditation, evidence of intoxication alone did not warrant a second degree murder instruction.  *Lopez I*, 163 Ariz. at 112-13, 786 P.2d at 963-64.  Because Petitioner did not argue that any other evidence indicated a jury could rationally find Petitioner guilty of second degree and not first degree murder, as would be required under *Beck*, the Arizona Supreme Court did not reach a conclusion contrary to clearly established Supreme Court law.  Additionally, Petitioner has not pointed to, and the Court is not aware of, any Supreme Court cases with materially identical facts in which a second degree murder instruction was required.

*Unreasonable Application Prong*

Petitioner cites evidence at trial indicating he was intoxicated during the relevant time period.  Evidence of voluntary intoxication at the time of the crimes is not sufficient, as a matter of law, to negate premeditation.  In *State v. Schurz*, 176 Ariz. 46, 54-55, 859 P.2d 156, 164-65 (1993), the Arizona Supreme Court noted that under A.R.S. § 13-503, "the jury may consider voluntary intoxication in determining culpable mental state only when the culpable mental state of 'intentionally or with the intent to' is a necessary element of the offense."  *See also State v. Ramos*, 133 Ariz. 4, 5, 648 P.2d 119, 120 (1982) (in light of the passage of § 13-503 "the jury may consider [voluntary] intoxication only if the crime charged requires the culpable mental state of intentionally or with the intent to").  The *Schurz* court further noted that under A.R.S. § 13-1105(A)(1) the culpable mental state for murder in the first degree is "[i]ntending or knowing that his conduct will cause death."  176 Ariz. at 54-55, 859 P.2d at 164-65.  These statutory provisions were passed in 1980 and were in effect at the time of the victim's murder.  *See Ramos*, 133 Ariz. at 5, 648 P.2d at 120.  In light of these statutory changes, the court stated:

The question before us is whether voluntary intoxication is material

because the charge against the defendant is "intending *or* knowing" rather than merely "knowing." Knowing is a less culpable mental state than intent but is included within it so that whenever a jury determines that a defendant has acted intentionally, it has necessarily concluded that he acted knowingly. A.R.S. § 13-202(C). *Having concluded that the defendant acted knowingly, the jury may not consider voluntary intoxication with respect to the defendant's culpable mental state. It follows that the giving of a voluntary intoxication instruction in a murder case in which both intent and knowing are alleged would be improper.* It would be plainly violative of A.R.S. § 13-503. In short, the "intending" component of an allegation of "intending or knowing" is superfluous. The jury should never reach the question of intent and, thus, the voluntary intoxication instruction would always be erroneous. As a matter of logic and statutory construction, an allegation of "intending or knowing" is indistinguishable from an allegation of "knowing." An inexorable result of the statute, then, is that voluntary intoxication under A.R.S. § 13-503 will be considered by the jury only when intent is alleged and knowing is not alleged.

*Schurz*, 176 Ariz. at 55, 859 P.2d at 165 (emphasis added).

In light of the provisions in A.R.S. §§ 13-503 and 13-1105(A)(1), the holdings of the Arizona Supreme Court, and the fact that the trial court instructed the jury that the proper mental state in support of premeditated first degree murder is that the defendant intended *or* knew his conduct would cause the death of another, voluntary intoxication does not negate a finding of first degree murder. Therefore, Petitioner was not entitled to a second degree murder instruction based on possible intoxication.

Petitioner also asserts that evidence that the murder was chaotic and impulsive in nature supported a lesser included second degree murder instruction. Although the murder scene was chaotic, there was no significant evidence presented at trial indicating a lack of premeditation. Specifically, there was no evidence of "sudden quarrel or heat of passion" that would negate a finding of premeditation under statutory law. *See* A.R.S. § 13-1101.1 (West 1988). The crime scene indicated an extended and significant struggle between the perpetrator and the victim, as reflected by the following evidence: the screen door was pushed outwards and had blood on it (RT 4/20/87 at 49); the bookcase was not upright and items from it were on the floor (*id.*); there were blood spatters on the living room walls, in the bed area, on the bathroom door, and on the kitchen walls and table (*id.* at 51-54); and the victim had defensive wounds on her arm (*id.* at 77; RT 4/22/87 vol. II at 9). Additionally,

the victim was stabbed approximately twenty-three times and her throat was cut (RT 4/22/87 vol. II at 5), the body was found with a pillow over her face, she was blindfolded with her pajama bottoms, and a long scarf was stuffed in her mouth (RT 4/20/87 at 44, 45; RT 4/22/87 vol. II at 5).

This evidence highlights the prolonged nature of the crime, and the fact that Petitioner's actions were premeditated and designed to cause death. *See Carriger v. Lewis*, 971 F.2d 329, 336 (9th Cir. 1992) (en banc) (relying on evidence that the victim was bound, beaten and strangled to conclude second degree murder instruction not warranted). The evidence presented at Petitioner's trial is entirely distinguishable from the *Vickers* case, upon which Petitioner relies, because Vickers presented evidence that he was prone to impulsive aggression and that he suffered from a brain disorder that caused his aggressive behavior. *Vickers*, 798 F.2d at 372. In contrast, Petitioner cites primarily limited testimony that he was intoxicated to some degree on the night of the crimes.

Finally, Petitioner was convicted of not only first degree murder, but also kidnaping, sexual assault, and burglary. Both kidnaping and burglary required the jury to find that Petitioner acted intentionally. These verdicts reflect a finding by the jury that, to the extent Petitioner was intoxicated, he was still capable of forming intent. Even if the jury thought the evidence of intoxication negated the culpable mental state of "intent to" for murder, by statutory definition intoxication cannot diminish the mental state of "knowingly." Petitioner has not pointed to anything in the record that would undercut the overwhelming evidence indicating that Petitioner's acts were done with "knowledge" that they would kill the victim. Additionally, the opening and closing arguments indicate that the thrust of Petitioner's defense was that he did not commit murder at all (RT 4/20/87 at 23, 26; RT 4/27/87 at 23, 27-39), not that he committed a lesser degree murder of murder. *See Beck*, 447 U.S. at 637 (reasoning that safeguard of lesser included instruction is necessary when evidence leaves no question defendant committed serious violent crime but there is doubt on an element of the capital offense). For all of these reasons, a lesser included offense instruction was not

1    required.

2           Petitioner was not constitutionally entitled to a second degree murder instruction; thus,

3    it was not objectively unreasonable for the Arizona Supreme Court to deny this claim.  Claim

4    2 is denied.

5           **Claim 5:  Insufficient Evidence of Sexual Assault**

6           Petitioner argues there was insufficient evidence to support his conviction for sexual

7    assault.  In particular, he contends there was no evidence of force or trauma to the victim's

8    vaginal area, and the evidence did not prove Petitioner was the source of the semen found

9    in the victim's body.  Petitioner argues that the evidence established only that the semen

10   came from a blood type B secretor and that a large number of people of various races are in

11   that group; additionally, there was no eyewitness testimony regarding the attacker's race.

12          The Arizona Supreme Court denied this claim based on the clearly established

13   Supreme Court law set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979).  *Lopez I*, 163 Ariz.

14   at 112, 786 P.2d at 963.  In *Jackson*, the Court held that when assessing the sufficiency of

15   the evidence, "the relevant question is whether, after viewing the evidence in the light most

16   favorable to the prosecution, any rational trier of fact could have found the essential elements

17   of the crime beyond a reasonable doubt.  443 U.S. at 319.  This type of claim is properly

18   analyzed under the deferential standard of § 2254(d)(1); thus, the Court asks whether it was

19   an objectively unreasonable application of *Jackson* for the Arizona Supreme Court to deny

20   this claim.  *See Sarausad v. Porter*, 479 F.3d 671, 677-78 (9th Cir.), *vacated in part on other*

21   *grounds*, 503 F.3d 822 (9th Cir. 2007).

22          Petitioner was convicted under A.R.S. § 13-1406(A), which provides that sexual

23   assault is committed "by intentionally or knowingly engaging in sexual intercourse . . . with

24   any person without consent of such person."  First, despite the absence of physical trauma

25   to the victim's vaginal area, there is sufficient and uncontradicted evidence that someone had

26   sexual intercourse with the victim without her consent.  The evidence established that there

27   was semen and sperm in the victim's body (RT 4/22/87 vol. II at 19), and the toxocologist

28

believed the sexual act occurred just prior to death (*id.* at 24).  There was considerable evidence of a significant struggle with the perpetrator and a lack of consent by the victim – the victim's throat was cut and she sustained more than twenty stab wounds (*id.* at 5), the body was found essentially naked with a pillow over her face, she was blindfolded with her pajama bottoms, and a long scarf was stuffed in her mouth (*id.*; RT 4/20/87 at 44, 45).

Second, there was sufficient evidence for a rational jury to conclude beyond a reasonable doubt that Petitioner was the source of the semen and the person who had committed the sexual assault.  The semen in the victim's body was from a blood type B secretor, the category to which Petitioner belongs; this type is found in four percent of the caucasian population, ten percent of the black population, and seven percent of the Hispanic population.  (RT 4/22/87 vol. II at 44.)  Blood found inside the victim's apartment, that did not belong to the victim, was consistent with Petitioner's blood type, which is found in less than one percent of the population.  (*Id.* at 74.)  Petitioner's palm print was found on the victim's kitchen wall (RT 4/22/87 vol. I at 16); Petitioner's finger print was found on the victim's window frame and on a piece of glass from a window broken out from the apartment (*id.* at 19, 22).  There was diluted blood in the victim's sink, indicating someone had used it to wash up.  (RT 4/20/87 at 56.)  A neighbor of the victim saw Petitioner walking down her street between 5:30 and 6:00 the morning of the crime, and he looked wet to her like he had washed off.  (RT 4/21/87 at 94-95.)

In light of all the above evidence, which was essentially uncontroverted, the Court finds pursuant to *Jackson* that a rational jury could have found Petitioner guilty beyond a reasonable doubt of sexual assault.  The Arizona Supreme Court's decision was not unreasonable; therefore, this claim is denied.

**Claim 7:  Failure to Consider Mitigation**

Petitioner alleges that the sentencing judge failed to consider and weigh mitigating evidence, and that Arizona law precluded consideration of evidence not proven to have a causal connection to the crime.

Petitioner alleges that he presented the following significant evidence:   he was intoxicated at the time of the crime; he suffered from pathological intoxication; he was homeless at the time of the crime; he had a history of substance abuse including the inhalation of toxic substances; he came from a dysfunctional family with severe problems and financial hardships; he had been abandoned by his father at a young age; he dropped out of high school and reads on a sixth grade level; some of his brothers have serious substance abuse problems and were imprisoned for violent behavior including homicide; and he had become a model prisoner.   Petitioner alleges the judge failed to consider and weigh this evidence, as demonstrated by his failure to find that Petitioner's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the law was significantly impaired, *see* A.R.S. § 13-703(g)(1), and his finding that Petitioner did not establish good behavior during incarceration.   Further, the judge failed to mention Petitioner's intoxication and dysfunctional family with a history of substance abuse.   Petitioner argues that the trial court failed to consider this evidence because Arizona law prohibited its consideration if no nexus to the crime was established.

Background

After remand, during the resentencing proceeding, Petitioner urged the court to find two mitigating circumstances – diminished capacity due to pathological intoxication and that Petitioner had evolved into a model prisoner.  (ROA 97 at 8-10; RT 7/13/90 P.M. at 4-5, 56-69; RT 8/3/90 at 19-25.)  The other mitigating circumstances identified by Petitioner in the Amended Petition appear to have been taken primarily from the PSR.

At sentencing, the judge stated, "the court has reviewed all of the evidence and exhibits presented at the hearing on July 13.  The court has further reviewed the State's supplemental sentencing memoranda and the defendant's post hearing memoranda concerning aggravating and mitigating factors."  (RT 8/3/90 at 2.)  The court noted that it conducted a new proceeding at which Petitioner was given the opportunity to establish any mitigating circumstances "of any nature whatsoever," whether set forth in the statute or not.

(*Id.* at 35-36.) The court further stated, "the court has considered all testimony and materials and evidence received at the time of the hearing on July 13, 1990." (*Id.* at 36.) The court made findings as to each available statutory mitigating circumstance, including Petitioner's argument that he was unable to appreciate the wrongfulness of his conduct or conform it to the law. (*Id.* at 40-41.) Further, the court considered and rejected Petitioner's argument that he was a model prisoner. (*Id.* at 41-42.) The court again reiterated that it had considered all trial evidence relevant to aggravating and mitigating circumstances and the testimony presented at the separate sentencing hearing, and that counsel had been given an opportunity to argue the existence of any mitigating circumstances whether statutory or not. (*Id.* at 42.) The court concluded there were no mitigating circumstances sufficiently substantial to call for leniency. (*Id.* at 43.)

The Arizona Supreme Court reviewed the evidence Petitioner presented during his resentencing proceeding regarding intoxication as evidence of the (G)(1) statutory mitigating factor. The court found that "[t]he trial court weighed this new evidence along with all of the other evidence in the record," but that Petitioner had failed to establish the (G)(1) factor. *Lopez II*, 175 Ariz. at 413, 857 P.2d at 1267. The court further agreed with the trial court that Petitioner had not proven pathological intoxication, therefore, it was not a mitigating circumstance. *Id.* at 414, 857 P.2d at 1268. Finally, the court rejected Petitioner's argument that the trial court failed to consider intoxication as non-statutory mitigation. *Id.* at 415-16, 857 P.2d at 1269-70. The Arizona Supreme Court agreed with the trial court that Petitioner's behavior in prison was not mitigating. *Id.* at 416-17, 857 P.2d at 1270-71.

Analysis

A sentencing court is required to consider any mitigation offered by a defendant, including non-statutory mitigation. *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *see also Ceja v. Stewart*, 97 F.3d 1246, 1251 (9th Cir. 1996). In *Lockett* and subsequently in *Eddings v. Oklahoma*, the Supreme Court held that under the Eighth and Fourteenth Amendments the sentencer must be allowed to consider, and may not refuse to consider, any constitutionally

1    relevant mitigating evidence.  *Eddings v. Oklahoma*, 455 U.S. 104, 113-14 (1982).

2    Constitutionally relevant mitigating evidence is "any aspect of a defendant's character or

3    record and any of the circumstances of the offense that the defendant proffers as a basis for

4    a sentence less than death."  *Lockett*, 438 U.S. at 604.  However, while the sentencer must

5    not be foreclosed from considering relevant mitigation, "it is free to assess how much weight

6    to assign such evidence."  *Ortiz v. Stewart*, 149 F.3d 923, 943 (9th Cir. 1998); *see Eddings*,

7    455 U.S. at 114-15 ("The sentencer . . . may determine the weight to be given the relevant

8    mitigating evidence.").  On habeas review, a federal court does not evaluate the substance

9    of each piece of evidence submitted as mitigation; rather, it reviews the state court record to

10   ensure the state court allowed and considered all relevant mitigation.  *See Jeffers v. Lewis*,

11   38 F.3d 411, 418 (9th Cir. 1994) (en banc) (when it is evident that all mitigating evidence

12   was considered, the trial court is not required to discuss each piece of evidence).

13        As noted by Petitioner (Dkt. 178 at 52-53), the judge made specific findings on the

14   mitigating factors urged by Petitioner – pathological intoxication and model prisoner

15   behavior.  While Petitioner disagrees with the court's findings, the court clearly considered

16   the evidence, which is the constitutional issue.  Petitioner argues that a constitutional

17   violation arises because the judge did not mention any other mitigation and did not weigh it

18   against the aggravation.  While Petitioner did not contend in state court that any other

19   evidence in the record was specifically mitigating, the judge clearly articulated more than

20   once that he considered all the mitigation presented, whether statutory or not, and found that

21   it did not warrant leniency.  The lack of discussion regarding specific mitigation does not

22   amount to a constitutional violation.  *See Parker v. Dugger*, 498 U.S. 308, 314-15, 318

23   (1991) (the sentencing court properly considered all information, including nonstatutory

24   mitigation, where the court stated that it considered all the evidence and found no mitigating

25   circumstances that outweighed the aggravating circumstances); *Moormann v. Schriro*, 426

26   F.3d 1044, 1055 (9th Cir. 2005) ("the trial court need not exhaustively analyze each

27   mitigating factor as long as a reviewing federal court can discern from the record that the

28

state court did indeed consider all mitigating evidence offered by the defendant").

Although not articulated as such, Petitioner's argument appears to be that because the trial court did not find his mitigation sufficient for leniency it must not have considered all of it. There is a distinction between "a failure to consider relevant evidence and a conclusion that such evidence was not mitigating"; the latter determination does not implicate a defendant's federal constitutional rights. *Williams v. Stewart*, 441 F.3d 1030, 1057 (9th Cir. 2006). Thus, the fact that the court found the evidence "inadequate to justify leniency . . . did not violate the Constitution." *Ortiz*, 149 F.3d at 943; *Eddings*, 455 at 114-15.

Petitioner contends that Arizona law required application of a causal connection between mitigating evidence and the crime; therefore, this Court must assume the trial court applied the requirement and on that basis excluded consideration of certain mitigation. First, this misconstrues Arizona law. *See State v. Newell*, 212 Ariz. 389, 405, 132 P.3d 833, 849 (2006) (mitigating evidence must be considered regardless of whether there is a "nexus" between the mitigating factor and the crime, but the lack of a causal connection may be considered in assessing the weight of the evidence). Second, pointedly absent from Petitioner's argument is any citation to the record indicating the court applied a causal connection. While Petitioner is correct in the abstract that courts generally presume a judge followed the law, such a presumption is only required when the court's decision leaves something unspoken. *See Bell v. Cone*, 543 U.S. 447, 455-457 (2005). In this case, the trial court clearly stated that it considered everything presented upon resentencing for purposes of aggravation and mitigation. That is all the constitution requires. *See Ortiz*, 149 F.3d at 943. Presuming the trial court applied a causal connection requirement and thereby excluded consideration of evidence as mitigation is contrary to the record and Arizona law. Finally, Petitioner's argument would require presuming that the trial court both applied Arizona law in an unconstitutional manner but did not apply governing federal constitutional law.

Moreover, the Arizona Supreme Court independently reviewed the record and agreed that "there are no mitigating circumstances, statutory or otherwise, sufficiently substantial

1    to call for leniency." *Lopez II*, 175 Ariz. at 417, 857 P.2d at 1271.  Even if the trial court had

2    committed constitutional error at sentencing, a proper and independent review of the

3    mitigation and aggravation by the Arizona Supreme Court cured any such defect.  *See*

4    *Clemons v. Mississippi*, 494 U.S. 738, 750, 754 (1990) (holding that appellate courts are able

5    to fully consider mitigating evidence and are constitutionally permitted to affirm a death

6    sentence based on independent re-weighing despite any error at sentencing).  Claim 7 is

7    denied.

8    **Claim 8:   Unconstitutional Application of the (F)(6) Aggravating Factor**

9        Petitioner alleges there was insufficient evidence to support the trial court's finding

10   of the (F)(6) aggravating factor – that the crime was cruel, heinous, and depraved.

11   Background

12       The trial court found that the crime was both cruel and heinous/depraved.  The court

13   cited the following trial evidence to support the cruelty finding:

14           The evidence established beyond a reasonable doubt that on October
     29, 1986, the defendant broke into the home of Estafana Holmes.  He raped
15   her, beat her and then brutally murdered her.

16           The evidence at trial shows that there was a tremendous struggle inside
     the victim's residence.  Blood spatter was located on the floor in the kitchen,
17   living room and the bathroom.  Blood spatter was also observed on the walls
     in the kitchen and the bathroom.  Samples of the blood were consistent with
18   the victim's.  The pools of blood reflected in the photographs admitted into
     evidence clearly indicate that at one point during the struggle the victim was
19   at least erect bleeding on to the floor, standing erect bleeding on to the floor.
     Undoubtedly she was either fighting the defendant and/or begging for her life.
20   Other signs of struggle inside the residence include a front screen door that
     was bent inward and a broken window.  Evidence indicates that the window
21   was broken from the inside out.

22           The victim, Estafana Holmes, was 59 years old.  She was a small
     woman.  She was approximately five foot two inches tall, weighed 124
23   pounds.  When Miss Holmes' body was discovered on the morning of the 29th,
     she was nude from the waist down.  The defendant had taken her pajama
24   bottoms, tied them snugly around her eyes.  A white lace scarf had been
     crammed tightly into her mouth.

25           Dr. Thomas Jarvis testified that Miss Holmes had approximately 23 stab
26   wounds in the left breast and upper chest area.  Many of these wounds would
     have by themselves been potentially fatal.  Her throat was cut.  She had three
27   superficial lacerations on her right arm.  She had superficial lacerations on her

28

- 36 -

right arm which were characterized as defensive type wounds.  The victim had three lacerations on her scalp and a stab wound to her left cheek.

According to Dr. Jarvis, these wounds were not fatal, but would have caused a considerable amount of bleeding.  Essie Holmes had bruises on her head and left hand.  Dr. Jarvis noticed dried blood streaming down her body and blood-sustained [sic] feet.  In his opinion, Mrs. Holmes was at some point either standing or sitting erect.  Vaginal swabs taken at the autopsy showed the presence of semen and spermatozoa.  According to Dr. Jarvis, none of the wounds were post-mortem.

(RT 8/3/90 at 37-39.)

In support of the court's finding that the crime was heinous or depraved, the court cited the following evidence:  "The defendant's sexual assault of the victim, whether occurred before or after death, the securing, the securing of the pajama bottoms about her eyes, the cramming of a scarf in the victim's mouth, all constitute evidence of the defendant's heinous and depraved mind."  (*Id.* at 39.)

The Arizona Supreme Court upheld both prongs of the (F)(6) factor, finding:

A murder is especially cruel if the victim consciously experiences physical abuse or mental anguish before death.  Mental suffering includes uncertainty over one's ultimate fate.  The victim's suffering, however, must have been foreseeable to the defendant.

The victim in this case was stabbed 23 times in the upper chest and three times in the abdomen.  Her throat was cut.  She was sexually assaulted and had semen in both her vagina and anus.  She had defensive wounds on her forearms.  There were bruises on her body.  The apartment was knocked asunder, evidencing a terrific struggle for life during which the victim was obviously conscious.  The top of the victim's shoes were bloodied, indicating that she had been standing up at some point after being stabbed.  This grisly and ultimately fatal nightmare lasted from three minutes to as long as 15 minutes.

Obviously, the victim endured great physical and mental suffering over a relatively protracted period of time while she struggled for her life.  Her suffering was not only foreseeable, it was unavoidably obvious to the defendant.

. . . .

Heinousness and depravity focus on the defendant's state of mind at the time of the offense.  In *Gretzler*, the court set forth several specific factors, which earlier cases suggested could appropriately be considered in determining whether a murder was especially heinous or depraved.  They were: (1) whether defendant relished the murder; (2) whether defendant inflicted gratuitous violence beyond that necessary to kill; (3) whether the defendant

- 37 -

mutilated the victim's body; (4) whether the crime was senseless; and (5) whether the victim was helpless.

Several of these items are satisfied here. The defendant inflicted gratuitous violence on the victim. Notwithstanding Dr. Keen's testimony that the wounds were all consistent with an attempt to inflict death, and the defendant's interpretation of that testimony as meaning that he repeatedly stabbed the victim out of surprise that she did not immediately die, the clear fact is that the multiple stab wounds in the chest and the abdomen, along with the throat cutting, certainly qualify as gratuitous violence. We reject defendant's argument that he should be credited with a wholesome mind because he chose a murder weapon that did not cause death instantaneously. Moreover, the knife wounds to the face, the sexual assault, the binding of the victim's eyes, and the gagging of her mouth were not directed toward killing the victim and clearly bespeak gratuitous violence.

The murder also was senseless. Although the defendant clearly intended to kill the victim, there was no reason to do so. The sexual assault could have been committed without the murder, and no other reason for the killing is apparent from the record. Nothing in the record suggests that the defendant and the victim knew each other or had any prior contact.

This case also meets the "helplessness" test of *Gretzler*. The victim was a 59-year-old, 124-pound woman. The defendant is a young man, then aged 24, and in apparent good health. The victim was gagged so she could not call out for help. At some point, she was blindfolded so she could not see. Although there was evidence of a prolonged struggle, for all practical purposes this uneven match was over after the first serious wounds were inflicted on the victim. In prior cases, we have held that a victim is helpless when disabled and unable to resist the murder.

*Lopez II*, 175 Ariz. at 411-12, 857 P.2d at 1265-66 (citations omitted).

<u>Analysis</u>

The appropriate standard on federal habeas review of a state court's application of an aggravating circumstance is the "rational factfinder" standard; i.e., "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found" the aggravating factor to exist. *Lewis v. Jeffers*, 497 U.S. 764, 781 (1990) (quoting *Jackson*, 443 U.S. at 319). This type of claim is properly analyzed under the deferential standard of § 2254(d)(1); thus, the Court asks whether it was an objectively unreasonable application of *Jackson* for the Arizona Supreme Court to deny this claim. *See Sarausad*, 479 F.3d at 677-78.

To dispute the cruelty finding, it appears Petitioner is arguing that he could not foresee

that the victim would suffer because of his impaired state of mind.  As stated by the Arizona

Supreme Court and recited above, and as noted by Petitioner (Dkt. 178 at 65), it is sufficient

if the victim's suffering is foreseeable; the State is not required to prove that a defendant in

fact foresaw the suffering.  *See State v. Trostle*, 191 Ariz. 4, 18, 951 P.2d 869, 883 (1997)

(the requirement is that defendant knew or "should have known" the victim would suffer).

The lengthy, brutal struggle and numerous injuries which the victim endured unquestionably

caused her to suffer physically and mentally, and that suffering was necessarily foreseeable.

Petitioner also argues that he could not form the mental state necessary for the

heinous/depraved prong of the (F)(6) factor.  Although Arizona caselaw refers to a

defendant's "state of mind" at the time of the offense as the relevant issue for the

heinous/depraved prong, the determination is based on the perpetrator's "words and acts" not

on a subjective mental state.  *See State v. Fulminante*, 161 Ariz. 237, 255, 778 P.2d 602, 620

(1988).  More specifically, there are five non-exclusive factors used by the courts to

determine if a murder was heinous or depraved:  relishing of the murder, the infliction of

gratuitous violence, mutilation of the victim's body, senselessness of the murder, and the

helplessness of the victim.  *Id.* at 256, 778 P.2d at 621 (citing *State v. Gretzler*, 135 Ariz. 42,

52-53, 659 P.2d 1, 11-12 (1983)).  Thus, a defendant's brain function or mental health are

not assessed in applying the (F)(6) prong; rather, impaired capacity is appropriately

categorized as mitigation.

Petitioner also argues that the findings of senselessness, helplessness, and gratuitous

violence are not supported by the evidence.  Viewing the evidence in the light most favorable

to the State, a rationale trier of fact could find each one of these *Gretzler* factors.  A fact

finder could determine from the record that the purpose of the crime was the sexual assault,

and the murder was not necessary to achieve that goal.  Therefore, the murder was senseless.

The age and size disparity between Petitioner and the victim, and the fact that she was

gagged and blindfolded at some point during the assault, support the finding that she was

helpless.  Finally, as stated by the Arizona Supreme Court, the more than twenty stab

wounds, the cutting of the victim's throat, and the numerous other injuries, as well as the gagging and sexual assault of the victim all evidence gratuitous violence.

Even if Petitioner were to rebut one prong of the (F)(6) factor, Arizona law indicates that the finding of either especial cruelty or especial depravity alone will establish the (F)(6) factor and that the validity, or lack thereof, of the other prong does not affect the weight given to the circumstance.  *See, e.g., State v. Djerf*, 191 Ariz. 583, 597, 959 P.2d 1274, 1288 (1998) ((F)(6) circumstance upheld based on cruelty alone without considering validity of depravity finding); *State v. Towery*, 186 Ariz. 168, 188, 920 P.2d 290, 310 (1996) (same); *State v. Roscoe*, 184 Ariz. 484, 500-01, 910 P.2d 635, 651-52 (1996) (upholding (F)(6) factor based on cruelty after invalidating depravity finding); *State v. Bolton*, 182 Ariz. 290, 312, 896 P.2d 830, 852 (1995) ((F)(6) factor upheld based on cruelty alone without considering depravity finding).

A rational fact finder could determine that the (F)(6) aggravating factor was satisfied; therefore, the Arizona Supreme Court's denial of this claim was not an unreasonable application of *Jackson*.  Claim 8 is denied.

## CONCLUSION

The Court finds that Petitioner has failed to establish entitlement to habeas relief on any of his claims.  The Court further finds that additional evidentiary development in this matter is neither warranted nor required.

## CERTIFICATE OF APPEALABILITY

In the event Petitioner appeals from this Court's judgment, and in the interests of conserving scarce resources that might be consumed drafting and reviewing a request for a certificate of appealability (COA) to this Court, the Court on its own initiative has evaluated the claims within the petition for suitability for the issuance of a certificate of appealability. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Rule 22(b) of the Federal Rules of Appellate Procedure provides that when an appeal is taken by a petitioner, the district judge who rendered the judgment "shall" either issue a

COA or state the reasons why such a certificate should not issue. Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate whether (1) the petition states a valid claim of the denial of a constitutional right and (2) the court's procedural ruling was correct. *Id.*

The Court finds that its procedural ruling finding Claim 1C procedurally defaulted in part, as discussed in this Order, is adequate to proceed on appeal. For the reasons stated in the Court's orders regarding the procedural status of Petitioner's claims filed on January 7, 2003 (Dkt. 92), and November 7, 2005 (Dkt. 160), the Court declines to issue a COA with respect to any other claims or portions of claims that were found to be procedurally barred. The Court finds that reasonable jurists, applying the deferential standard of review set forth in the AEDPA, which requires this Court to evaluate state court decisions in the light of clearly established federal law as determined by the United States Supreme Court, could not debate its resolution of the merits of Petitioner's claims as set forth in this Order nor its orders of March 25, 2004 (Dkt. 131), and November 7, 2005 (Dkt. 160).

Accordingly,

**IT IS ORDERED** that Petitioner's Amended Petition for Writ of Habeas Corpus (Dkt. 27) is **DENIED**. The Clerk of Court shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that the stay of execution entered on January 14, 1998 (Dkt. 3) is **VACATED**.

**IT IS FURTHER ORDERED GRANTING** a Certificate of Appealability as to the following issue:

Whether Claim 1C of the Amended Petition – alleging ineffective assistance

1

of counsel for failure to investigate and prepare the case for sentencing including failure to prepare the expert – is, in part, procedurally barred.

2

**IT IS FURTHER ORDERED** that the Clerk of Court forward a copy of this Order

3

to Rachelle M. Resnick, Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix,

4

AZ 85007-3329.

5

DATED this 15th day of July, 2008.

6

7

8

9

_____
Stephen M. McNamee
United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 42 -